Filed 3/2/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| HOLISTIC SUPPLEMENTS, L.L.C., et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>CHRISTOPHER STARK et al.,<br><br>Defendants and Respondents. | B300711<br><br>(Los Angeles County<br>Super. Ct. No. BC599796) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Rupert A. Byrdsong, Judge. Reversed and remanded.

Horvitz & Levy, Lisa Perrochet and Aaron Henson; Nelson Hardiman, Salvatore J. Zimmitti and Mark S. Hardiman for Plaintiffs and Appellants.

Buchalter, Robert M. Dato; and Arthur D. Hodge for Defendants and Respondents.

_____

This case arises from an ownership dispute over a medical marijuana dispensary in Los Angeles. In essence, plaintiff Jamie Kersey claims defendant Christopher Stark transferred his ownership in Holistic Supplements, L.L.C. (hereafter the LLC) to her in April 2015. Unbeknownst to Kersey and despite that alleged transfer, he later converted the LLC from a limited liability company to a corporation and then a mutual benefit corporation in his name called Holistic Supplements Inc. (the corporation) and changed the business address. In that process, he claimed rights to a Business Tax Registration Certificate, a city-issued tax document that enabled the dispensary to operate.

Kersey and the LLC sued Stark and the corporation for conversion, unfair competition, and declaratory relief, among other claims. The case went to a jury trial, presenting the core factual dispute of whether Stark validly signed the April 2015 transfer documents or whether his signatures were forged. The jury ultimately decided only a single claim of conversion asserted by the LLC against the corporation, returning a defense verdict. The trial court removed the rest of the claims from the jury by granting nonsuit to defendants.

On appeal, plaintiffs argue nonsuit was improper and the trial court committed prejudicial instructional error on the conversion claim decided by the jury. We agree on both points. We conclude: (1) nonsuit was erroneous on Kersey's individual claims because she has standing to sue for conversion of her personal property membership interest in the LLC; (2) nonsuit was erroneous on claims against Stark in his individual capacity, since he can be held liable for personally participating in the tortious conduct of the corporation; (3) nonsuit was erroneous on plaintiffs' claims under the unfair competition law (Bus. & Prof.

Code, § 17200 et seq.; the UCL) because we reject the only two grounds for nonsuit defendants raise on appeal; and (4) the BTRC is property subject to conversion, so the trial court prejudicially erred when it instructed the jury it was not.

We also reject defendants' contention Kersey lacked standing because she failed to file a petition for reinstatement of the LLC pursuant to Government Code section 12261.  The plain language of that provision permits a court to order reinstatement of a falsely or fraudulently terminated business entity upon *either* submission of "a petition to the superior court containing the legal and factual basis for reinstatement *or* as part of a civil action for damages or equitable relief."  (Gov. Code, § 12261, subd. (c), italics added.)  Plaintiffs permissibly sought reinstatement as part of this lawsuit, so they did not need to file a separate petition in the superior court.

We reverse the judgment.

## BACKGROUND

Holistic Supplements, LLC is a limited liability company formed in 2005 to operate a medical marijuana dispensary in Canoga Park consistent with California's Medical Marijuana Program Act.  (Health & Saf. Code, § 11362.7 et seq.)  For practical purposes, Brad Barnes owned the dispensary.  He also owned a strip club, a bar, and an adult entertainment store in the same shopping center.  Although Barnes was a member of the LLCs that owned his other businesses, he was not a member of the LLC that owned the dispensary.  Instead, the sole member was David Gold, with Barnes overseeing operations.  Barnes worried having his name on the LLC would jeopardize the licenses for his other businesses.  So in exchange for 10 percent of

3

the dispensary's net revenue, he and Gold agreed Gold would be listed as the sole member of the LLC.

Shortly after formation, the LLC obtained a Business Tax Registration Certificate, or BTRC, from the City of Los Angeles (the City), listing the dispensary's Canoga Park address. The City requires every business to have a BTRC, not just marijuana dispensaries. (L.A. Mun. Code, § 21.03, subd. (a).) The BTRC bears the disclaimer: "ISSUED FOR TAX COMPLIANCE PURPOSES ONLY [¶] NOT A LICENSE, PERMIT, OR LAND USE AUTHORIZATION." As we will discuss in more detail below, various City laws after 2007 prevented medical marijuana dispensaries from operating unless they had a pre-2007 BTRC. In light of this prohibition, the LLC's grandfathered BTRC allowed it to continue operating after 2007.

In April 2014, Gold left the LLC and transferred his interest to defendant Christopher Stark, Barnes's friend and employee at the strip club. Gold backed out because he no longer wanted to work with Barnes. He also feared he might be arrested after the dispensary was raided by police in 2011.

In July 2014, the LLC filed an updated "Statement of Information" with the Secretary of State reflecting Stark as the new sole member. Barnes and Stark orally agreed to the same arrangement Barnes had with Gold—Stark would be the sole member of the LLC in exchange for 10 percent of net revenue.

The dispensary was not profitable during this time, and by the start of 2015, the relationship between Stark and Barnes had deteriorated. The parties dispute what happened next.

According to plaintiffs, in April 2015, Stark told plaintiff Kersey (who is Barnes's ex-wife) and the dispensary's corporate attorney Robert Manuwal that he no longer wanted to own the

dispensary. Stark explained he didn't want to work with Barnes anymore, the dispensary wasn't profitable, and the dispensary still owed Barnes for financing the opening and fixing property damage from the 2011 raids. Barnes testified Stark agreed to transfer his LLC interest to Kersey. Kersey similarly testified she talked to Stark, who agreed to transfer his ownership to her in exchange for her agreeing to repay the dispensary's debt to Barnes.

Documents dated April 23, 2015 reflect the transfer of ownership of the LLC from Stark to Kersey. They bear Stark's signatures, but Stark disputes their authenticity. Kersey, attorney Manuwal, and Barnes testified that on the night of April 23, 2015, Stark and Kersey signed these documents at Manuwal's home transferring Stark's interest in the dispensary to Kersey, leaving her with the debts and assets of the LLC. Manuwal and Barnes testified they personally witnessed Stark signing; Kersey arrived later.

For his part, Stark confirmed he went to Manuwal's house that night. He claimed he went to pick up dispensary-related documents and endorse some checks at Barnes's request. The only documents he signed were the check endorsements; he did not sign any transfer documents and claimed his signatures were forgeries. When pressed at trial, he conceded the signatures could be his, but he never knowingly signed any documents transferring his interest in the LLC.

After that night, Stark had no further involvement in the dispensary operations at the Canoga Park location. He never returned to pick up any assets, cash, marijuana product, or equipment. The day after the alleged transfer, Kersey met with dispensary employees to tell them about the change in

5

ownership. Dispensary operations continued as normal. A few weeks later on May 11, 2015, the LLC filed an updated "Statement of Information" with the Secretary of State identifying Kersey as the new sole member.

Unbeknownst to Kersey and Barnes, Stark did not relinquish his ownership of the LLC. On September 2, 2015, he filed "Articles of Incorporation With Statement of Conversion" with the Secretary of State. The form listed Stark as the managing member of the LLC and purported to convert the LLC to Holistic Supplements, Inc., a corporation with Stark as the sole shareholder. The document listed Stark's home address as the business address for the corporation. On September 30, 2015, Stark converted the corporation to a nonprofit mutual benefit corporation "in order to comply with state and local laws and regulations." He was still listed as the sole shareholder. He filed a statement of information with the Secretary of State on the same day listing the corporation's address as his home address.

On September 30, 2015, Kersey and Barnes first learned Stark was still claiming ownership of the dispensary. Kersey and the LLC filed this lawsuit against Stark and the corporation in November 2015. As relevant here, Kersey and the LLC each asserted causes of action for conversion, violation of the UCL, and declaratory relief.[1]

In December 2015, Stark changed the address for the BTRC to a downtown Los Angeles location. Throughout 2016, the parties submitted a number of competing requests to change

---

[1] Plaintiffs also asserted claims for corporate identity theft and trade name infringement, but those claims were dismissed at trial and are not at issue here.

the BTRC address back and forth between the Canoga Park and downtown Los Angeles locations. The City eventually froze the BTRC at Stark's downtown address sometime in late 2016 or 2017, saying a court must determine the rightful owner of the tax account.

In response to the dispute over the BTRC, plaintiffs filed a supplemental complaint, alleging defendants had illegally operated a dispensary at the downtown Los Angeles location between December 2015 through April 2017, and had "hijacked . . . and purported to use [the LLC's] business taxation accounts, including business tax registration certificate account no. 0002072981-0001-4." Plaintiffs alleged Stark's attempts to take the BTRC were additional bases for their unfair competition, conversion, and declaratory relief claims.

For the declaratory relief claim, plaintiffs alleged Stark "was never authorized to change Holistic Supplements, LLC's organization from a limited liability company to a stock corporation to a mutual benefit corporation; or change the registered address associated with the BTRC." Plaintiffs sought "a judicial declaration of the rights and duties of Defendants with respect to entities known as Holistic Supplements, LLC and Holistic Supplements, a California non-profit mutual benefit corporation." In the prayer for relief, plaintiffs sought declarations that Stark had unlawfully converted the LLC to the corporation; Kersey "is the owner and managing member of Holistic Supplements, LLC"; Stark "is not the owner of Holistic Supplements, LLC and/or any of the converted entities"; and Kersey had the authority to manage the BTRC whereas Stark did not.

The case proceeded to a jury trial. Kersey testified she had ceased operations of the dispensary in Canoga Park because it could not operate without the BTRC. Stark testified his downtown Los Angeles dispensary was associated with an investor who agreed to buy the corporation from Stark for $1.85 million should he win this lawsuit and be found owner of the dispensary and the BTRC. The same investor was financing Stark's legal defense.

After plaintiffs' opening statement, defendants moved for nonsuit. The court deferred ruling until the close of evidence, at which point it granted the motion. It dismissed all of Kersey's individual claims, all claims against Stark individually, and plaintiffs' UCL claims. The court did not set forth the reasons in an order or on the record in open court. All that remained were the LLC's claims for conversion and declaratory relief against the corporation. The jury returned a defense verdict for the corporation on the conversion claim. The LLC dismissed its remaining declaratory relief claim with prejudice and plaintiffs appealed the defense judgment.

## DISCUSSION

### 1. Nonsuit Was Improper

#### Standard of Review

"A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff[']s evidence

8

all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff[']s favor." ' [Citation.] A mere 'scintilla of evidence' does not create a conflict for the jury's resolution; 'there must be *substantial evidence* to create the necessary conflict.' " (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 (*Nally*).)

We review the grant of nonsuit de novo. (*Legendary Investors Group No. 1, LLC v. Niemann* (2014) 224 Cal.App.4th 1407, 1422.) "In reviewing a grant of nonsuit, we are 'guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff.' [Citation.] We will not sustain the judgment ' "unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law." ' " (*Nally, supra*, 47 Cal.3d at p. 291.)

There is a split of authority on whether our review of a nonsuit motion is limited to the reasons given by the trial court or whether we may examine grounds raised by a defendant but *not* ruled on by the trial court in order to affirm the ruling. (Compare *Alpert v. Villa Romano Homeowners Assn.* (2000) 81 Cal.App.4th 1320, 1328, fn. 8 [noting split of authority over whether review of grant of nonsuit is limited to grounds raised by defendant *and* ruled on by trial court] with *Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1542, fn. 2 [rejecting narrow scope of review and finding no bar to the "consideration on appeal of alternative grounds which were stated by the moving party but which were not among those relied upon by the trial court in granting the motion"].)

We need not take a side.  The trial court did not explain its reasons for granting nonsuit on plaintiffs' various claims, so presumably the court accepted the reasons presented by defendants.  In any case, all the issues raised by defendants were legal questions and did not turn on the evidence presented.  We may address them to determine "whether, as a matter of law, there is no basis for the plaintiff's claim."  (*Alpert v. Villa Romano Homeowners Assn., supra,* 81 Cal.App.4th at p. 1328, fn. 8.)

### *Kersey Has Standing to Pursue Individual Claims*

Defendants sought nonsuit on Kersey's individual claims because they believed she lacked standing to assert the LLC's derivative claims in an individual capacity.  In response, Kersey argued she was asserting individual claims based on the theft of her membership interest in the LLC as distinct from any derivative claim for injury to LLC assets.  Kersey is correct.[2]

"[I]t is settled that one who has suffered injury both as an individual owner of a corporate entity and in an individual capacity is entitled to pursue remedies in both capacities." (*Denevi v. LGCC, LLC* (2004) 121 Cal.App.4th 1211, 1221.) The line between personal and derivative claims is drawn according to the injury inflicted:  "The claims are derivative where the injury alleged is one inflicted on the corporate entity or on the 'whole body of its stock.'  [Citation.]  A personal claim, in contrast, asserts a right against the corporation which the shareholder possesses as an individual apart from the corporate

---

[2]    On appeal, the parties do not draw any distinction among the conversion, UCL, and declaratory relief claims for the purpose of analyzing Kersey's standing.  We will likewise handle them together for the purpose of our opinion.

10

entity: 'If the injury is not incidental to an injury to the corporation, an individual cause of action exists.' " (*Id.* at p. 1222.) "In determining whether an individual action as opposed to a derivative action lies, a court looks at 'the gravamen of the wrong alleged in the pleadings.' " (*PacLink Communications Internat., Inc. v. Superior Court* (2001) 90 Cal.App.4th 958, 965 (*PacLink*).)

The " 'gravamen' " of Kersey's individual claims was the injury inflicted when "[d]efendants willfully took [her] membership interest in Plaintiff Holistic Supplements, LLC by changing its organization from a limited liability company to a stock corporation to a mutual benefit corporation; changing the registered address associated with the BTRC; and causing the City of Los Angeles Office of Finance to place a freeze on the BTRC." Kersey's membership interest in the LLC was personal property belonging to her as an individual. (Corp. Code, § 17701.02, subd. (r) ["membership interest" in LLC encompasses "member's rights in the [LLC], including the member's *transferable interest*," italics added]; *id.*, § 17705.01 ["transferable interest" in LLC is "personal property"]; *id.*, § 17701.02, subd. (aa) ["transferable interest" in LLC includes "right . . . to receive distributions from a limited liability company"].) As personal property, Kersey's membership interest could be subject to individual claims based on theft of that interest.

An apt analogy is to the law of corporate stock. California law treats corporate stock as personal property, and an individual shareholder may bring personal claims for conversion based on theft of that stock. (*Payne v. Elliot* (1880) 54 Cal. 339, 342 (*Payne*); *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 122 (*Fremont*) [" 'It is a uniform rule

11

of law that shares of stock of a company are subject to an action in conversion.' "]; *Haro v. Ibarra* (2009) 180 Cal.App.4th 823, 835 (*Haro*).)  In *Haro*, for example, former shareholders brought individual claims for conversion of their stock and derivative claims for breach of fiduciary duty on behalf of the corporation and shareholders.  (*Id.* at pp. 826–830.)  The court allowed the conversion claim to proceed, finding the plaintiffs adequately alleged the defendants engaged in a wrongful scheme to deprive the plaintiffs of ownership of their shares in the corporation.  (*Id.* at p. 835.)  Kersey's claim of conversion of her personal property membership interest in the LLC is no different.

Defendants characterize Kersey's claims as derivative based on *PacLink*.  While *PacLink* involved a dispute among members of an LLC, its resemblance to this case ends there.  Minority members of the LLC alleged the majority shareholders defrauded them through a series of transfers of the LLC's assets.  (*PacLink, supra,* 90 Cal.App.4th at p. 961.)  They asserted personal causes of action alleging " '[t]he fraudulent transfers and the conversion of the "sale" proceeds rendered [the LLC] insolvent and thereby defrauded plaintiffs by preventing them from being paid for their Ownership Interests in [the LLC] and its business and assets.' "  (*Id.* at pp. 961–962.)  Two of the defendants demurred, arguing the plaintiffs lacked standing to bring their claims as individuals because the real party in interest was the LLC, and " 'the gravamen of the claim is that [its] assets and net worth have been diminished.  Plaintiffs do not claim any direct injury or loss suffered by them; their only claim is that the value of the LLC was diminished and that their ownership interests as members were thereby diminished.  The claim belongs to the LLC, not to the plaintiffs.' "  (*Id.* at p. 962.)

The *PacLink* court agreed. "[T]he essence of plaintiffs' claim is that the assets of [the LLC] were fraudulently transferred without any compensation being paid to the LLC. This constitutes an injury to the company itself. Because members of the LLC hold no direct ownership in the company's assets [citation], the members cannot be directly injured when the company is improperly deprived of those assets. The injury was essentially a diminution in the value of their membership interest in the LLC occasioned by the loss of the company's assets. Consequently, any injury to plaintiffs was incidental to the injury suffered by [the LLC]." (*PacLink, supra,* 90 Cal.App.4th at p. 964.)

Kersey's claims look nothing like the derivative claims in *Paclink*. They are not based on any alleged diminution of the value of the LLC's assets. The LLC has alleged those claims on its own behalf.[3] Instead, Kersey claims Stark's actions in reorganizing the LLC and naming himself as sole shareholder amounted to theft of her personal property membership interest in the LLC. The distinction in *Haro* fits this scenario snugly: Kersey may pursue her personal claims to recover for the direct injury caused by Stark's alleged theft of her personal property membership interest, apart from any derivative claims for injury

---

[3]    Plaintiffs label the LLC's claims as "derivative." That may not be accurate since the LLC has sued in its own name. (See *PacLink, supra,* 90 Cal.App.4th at p. 965 [corporate entity must " ' "itself bring the action to recover the losses thereby occasioned, or *if the corporation fails to bring an action*, suit may be filed by a stockholder acting derivatively on behalf of the corporation," ' " italics added].) The parties have not addressed the issue further; neither do we.

13

to the LLC's assets.  The trial court erred in granting nonsuit on these claims.

### Stark Can Be Personally Liable for Plaintiffs' Claims

In a brief comment to the trial court, defendants argued for nonsuit on all of plaintiffs' claims asserted against Stark individually, claiming Stark "did not do anything to individually gain by any evidence.  Anything that happened here is part of Holistic Supplements, the corporation.  There's no evidence Mr. Stark personally benefitted in any way related to this assignment or transfer."  Their position is incorrect.

As the director and shareholder of the corporation, Stark could be held personally liable for participating in, directing, or authorizing tortious conduct.  (*Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 504 (*Frances T.*) ["Directors are liable to third persons injured by their own tortious conduct regardless of whether they acted on behalf of the corporation and regardless of whether the corporation is also liable."]; *Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 785 ["Shareholders of a corporation are not normally liable for its torts, but personal liability may attach to them . . . when the shareholder specifically directed or authorized the wrongful acts."]; *United States Liability Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 595 ["Directors or officers of a corporation do not incur personal liability for torts of the corporation merely by reason of their official position, unless they participate in the wrong or authorize or direct that it be done.  They may be liable, under the rules of

14

tort and agency, for tortious acts committed on behalf of the corporation."].)[4]

Stark personally performed every act plaintiffs claim was tortious. He secretly converted the LLC to a corporation, then a mutual benefit corporation; he changed the corporate address to his home address; and he changed the address of the BTRC to the downtown Los Angeles location. If a jury were to conclude he validly signed the documents in April 2015 transferring his membership interest in the LLC to Kersey, it could find his later actions exercising ownership over the LLC were unlawful and he was personally liable for the torts he committed on behalf of the corporation.

Defendants assert a few brief arguments in response, but none is meritorious. They contend plaintiffs should not be allowed to obtain a new trial on the core ownership issue because

---

[4] Stark does not suggest a different rule applies after he converted the corporation to a nonprofit mutual benefit corporation. (See, e.g., *Frances T., supra,* 42 Cal.3d at p. 500, fn. 7 [noting case involved nonprofit mutual benefit corporation].) The same rule also governs any acts Stark took as sole member of the LLC. (Corp. Code, § 17703.04, subd. (b) ["A member of a limited liability company shall be . . . personally liable under a judgment of a court or for any debt, obligation, or liability of the limited liability company, whether that liability or obligation arises in contract, tort, or otherwise, under the same or similar circumstances and to the same extent as a shareholder of a corporation may be personally liable for any debt, obligation, or liability of the corporation."]; see *id.*, § 17703.04, subd. (c) ["Nothing in this section shall be construed to affect the liability of a member of a limited liability company to third parties for the member's participation in tortious conduct."]; *People v. Pacific Landmark, LLC* (2005) 129 Cal.App.4th 1203, 1212.)

15

the LLC dismissed its remaining declaratory relief claim after the jury's verdict.  However, our opinion will permit plaintiffs to proceed on five claims, including Kersey's individual claim for declaratory relief.  Those claims will present and resolve the core ownership dispute between Kersey and Stark.  The LLC's dismissal of its declaratory relief claim does not affect them.

To the extent defendants suggest Stark didn't "personally benefit" from the conversion of the LLC and change of address for the BTRC, they are wrong.  Stark is claiming ownership of a corporation authorized to run a valuable medical marijuana dispensary in Los Angeles.  Apparently the business is worth nearly $2 million, the price in the contract he has in place to sell the corporation should he prevail here.  Stark will surely personally benefit as sole shareholder of the corporation if he wins and sells the business.

Defendants respond that Stark didn't personally benefit because the BTRC was never technically "transferred" from the LLC to the corporation.  They are correct that a business entity converting to another type of business entity is "the same entity that existed before the conversion and the conversion shall not be deemed a transfer of property."  (Corp. Code, § 17710.09, subd. (a).)  Upon conversion, however, "[a]ll the rights and property, whether real, personal, or mixed, of the converting entity or converting limited liability company are vested in the converted entity or converted limited liability company."  (*Id.*, § 11710.09, subd. (b)(1).)  If a jury were to find Stark was no longer owner of the LLC, it could readily conclude he personally benefitted when he wrongly took over the LLC and the BTRC, since the BTRC moved with the LLC's "rights and property" when he converted the LLC to a corporation.

16

The trial court erred in granting nonsuit on the claims against Stark individually.

*Plaintiffs' UCL Claims May Proceed*

"The purpose of the UCL . . . 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.  [Citation.]'  [Citation.]  It 'defines "unfair competition" to mean and include "any unlawful, unfair or fraudulent business act or practice." ' "  (*McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1470.)  "Because the statute is framed in the disjunctive, a business practice need only meet one of the three criteria to be considered unfair competition."  (*Id.* at p. 1471.)

On appeal, plaintiffs have not briefed their claims based on the fraudulent prong.  We find those claims forfeited.  (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125.)

As for plaintiffs' unfair and unlawful conduct UCL claims, defendants' perfunctory defense of the nonsuit rests on two legal errors.[5]

Their first claim is that the BTRC is not property and cannot be the subject of restitution.  Below we reject this mistaken view; the BTRC indeed counts as property.

Defendants' second claim is the LLC had to exhaust administrative remedies.  This "exhaustion" argument is based upon their position plaintiffs were required to petition for

---

[5]     We will not address the trial court's tentative passing comment that plaintiffs' UCL claims were not viable because "[t]here was no evidence regarding whatever business Mr. Stark was trying to set up was in competition or unfair competition."  Defendants did not advance that ground in their nonsuit motion and do not raise it on appeal.

17

reinstatement of the LLC pursuant to Government Code section 12261 before filing suit. As we explain below, we disagree.

The trial court erred in granting nonsuit on plaintiffs' UCL claims to the extent they were based on unlawful and unfair conduct. They must be remanded for further proceedings.

**2. The Trial Court Incorrectly Instructed the Jury the BTRC Was Not Property For Purposes of Conversion**

For the conversion claim that went to the jury, plaintiffs contend the trial court committed prejudicial instructional error when it refused to instruct the jury the BTRC was property subject to conversion, and then, in response to a jury question, told them it was *not* property. We agree the BTRC qualifies as property under the circumstances. The court's instruction was legally incorrect, and it almost certainly led to the defense verdict.

<u>Background</u>

The parties agreed to give the following modified version of CACI No. 2100 on the elements of conversion, which did not define the term "property":

"In its cause of action for conversion, Holistic Supplements, LLC claims that Holistic Supplements, the corporation, wrongfully exercised control over Holistic Supplements LLC's property. To establish this claim, Holistic Supplements, LLC must prove all of the following essential elements:

"1. Holistic Supplements LLC had a right to possess the property;

"2. Holistic Supplements, the corporation, intentionally and substantially interfered with Holistic Supplements, LLC's property by taking possession of the property, or assuming

18

control or ownership over the property, or applying the property to his or its own use;

"3.     Holistic Supplements, LLC did not consent;

"4.     Holistic Supplements, LLC was harmed; and

"5.     Holistic Supplements, the corporation's conduct was a substantial factor in causing Holistic Supplements, LLC's harm."

The LLC requested an additional instruction that defined the BTRC as property:  "A Business Tax Registration Certificate or BTRC issued by the City of Los Angeles to a medical marijuana dispensary is property."  The LLC argued it had a protectable property interest in the BTRC that could be subject to conversion.  Defendants argued the BTRC was not property, but rather a "tax certificate for purposes of tracking the collection of tax."  The trial court refused to give the instruction, but permitted the parties to "argue what they want to argue."

The jury was given a special verdict form setting out the elements of conversion.  Like the instructions, the form did not define what "property" was subject to the conversion claim.

An hour into deliberations, the jury sent the court questions asking, "On the verdict form, what does 'property' refer to?" and "Can the BTRC be legally considered property?"  The court conferred with the parties and submitted written responses, which are not in the record.  According to the trial transcript, the parties agreed to respond that "property" in the verdict form referred to "things under the control of the party."  That response is not at issue.

On the second question about the BTRC, the parties once again argued their positions.  The court decided to answer the question "no," effectively instructing the jury that a BTRC is *not*

19

property as a matter of law.  The LLC complained this was tantamount to a directed verdict "on the state of the evidence." The court disagreed, saying, "You don't know what they're considering," and "Maybe they're figuring something else out."

Ten minutes after getting these responses, the jury came back with a defense verdict.  It found on the verdict form that the LLC had a right to possess "the property," but the corporation did not "intentionally and substantially interfere with Plaintiff Holistic Supplements, LLC's property by taking possession of the property, or assuming control or ownership over the property, or applying the property to its own use[.]"

*Analysis*

We review a claim of instructional error de novo.  (*Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995, 1021.)  "[W]e view the evidence in the light most favorable to the appellant.  In such cases, we assume that the jury might have believed the evidence upon which the instruction favorable to the appellant was predicated." (*Alcala v. Vazmar Corp.* (2008) 167 Cal.App.4th 747, 754.)  We will not reverse unless it is reasonably probable the error affected the verdict. To evaluate prejudice, we examine " '(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled.' " (*Id.* at p. 755.)

The definition of property in California is broad, encompassing nearly every "thing" over which a person can exercise ownership.  (Civ. Code, § 654 ["The ownership of a thing is the right of one or more persons to possess and use it to the exclusion of others.  In this Code, the thing of which there may be ownership is called property."]; see Civ. Code, § 655 ["There may

20

be ownership of all inanimate things which are capable of appropriation or of manual delivery; of all domestic animals; of all obligations; of such products of labor or skill as the composition of an author, the good will of a business, trade marks and signs, and of rights created or granted by statute."].)

The type of property that can be subject to conversion is similarly broad. It includes not only tangible things, but " ' "every intangible benefit and prerogative susceptible of possession or disposition." [Citation.]' " (*Welco Electronics, Inc. v. Mora* (2014) 223 Cal.App.4th 202, 211 (*Welco Electronics*).) Courts have held a wide array of intangible interests may be converted, including a business's net operating loss (*Fremont, supra,* 148 Cal.App.4th at p. 122), a credit line from a credit card (*Welco Electronics, supra,* 223 Cal.App.4th at p. 212), and corporate stock (*Payne, supra,* 54 Cal. at p. 342), to name a few. The question here is whether we may add the BTRC to this list.

We start with the nature of the BTRC. Every business within the City of Los Angeles must pay a business tax and obtain a BTRC in order to operate. (L.A. Mun. Code, § 21.03, subds. (a) & (b).) It is not a permit to do business, so obtaining a BTRC does not "authoriz[e] the conduct or continuance of any illegal business or of a legal business in an illegal manner." (*Id.*, § 21.01.) Indeed, each BTRC must have this disclaimer printed on the back: "This certificate does not authorize the person to conduct any unlawful business or to conduct any lawful business in an illegal manner or to conduct within the City of Los Angeles the business for which this certificate has been issued without strictly complying with all the provisions of the ordinances of said City, including but not limited to those requiring a permit from any board, commission, department or

21

office of the City.  THIS BUSINESS TAX REGISTRATION CERTIFICATE DOES NOT CONSTITUTE A PERMIT."  (*Id.*, § 21.08, subd. (b).)  As defendants point out, the BTRC at issue here had a similar disclaimer that it was "ISSUED FOR TAX COMPLIANCE PURPOSES ONLY [¶]  NOT A LICENSE, PERMIT, OR LAND USE AUTHORIZATION."

Under this scheme, then, a BTRC is a *required*, but not necessarily *sufficient*, step to operate a business in the City.

A BTRC also has limited transferability.  While it is not transferable *on its own*, it is transferable "where the business taxed is transferred, whether by sale or otherwise, to another person under such circumstances that the real or ultimate ownership of the business after the transfer is substantially similar to the real or ultimate ownership existing before the transfer.  For purposes of this section, stockholders, bond-holders, partners, or other persons holding an interest in a corporation or other entity herein defined to be a person are regarded as having the real or ultimate ownership of such corporation or other entity." (L.A. Mun. Code, § 21.11.)

The BTRC in dispute here—obtained by the LLC prior to 2007 to operate a medical marijuana dispensary—gained additional significance due to the developments in marijuana regulation in the City.  Many cases have traced the history of marijuana laws in California and we need not repeat it.  (See, e.g., *Safe Life Caregivers v. City of Los Angeles* (2016) 243 Cal.App.4th 1029, 1033–1038 (*Safe Life Caregivers*) [summarizing medical marijuana law up to 2016].)  Suffice it to say, starting in 2007, the City made several attempts to regulate medical marijuana dispensaries consistent with state law.  The first law was a temporary Interim Control Ordinance that barred

22

"Medical Marijuana Dispensaries," except for "any dispensary established before the ordinance's effective date (Sept. 14, 2007) and operating in accordance with state law, if the owner or operator of the dispensary were to register with the City Clerk by filing certain identified documents within 60 days (Nov. 13, 2007)." (*Id.* at pp. 1034–1035.) Those documents included a BTRC. (*420 Caregivers, LLC. v. City of Los Angeles* (2012) 219 Cal.App.4th 1316, 1327, fn. 3.)

After other legal developments between 2007 and 2013 (see *Safe Life Caregivers, supra,* 243 Cal.App.4th at pp. 1035–1037), City voters enacted Proposition D in May 2013. Proposition D banned all medical marijuana businesses in the City but granted "limited immunity from prosecution under Los Angeles Municipal Code sections 11.00 (code violations generally) and 12.27.1 (administrative nuisance abatement) to some establishments that are medical marijuana businesses as defined under the ordinance. . . . [T]his limited immunity extends 'only [to] a medical marijuana business at the one location identified in its original or any amended business tax registration certificate issued by the City, and only if that medical marijuana business does not violate any of' the 15 conditions" set forth in Proposition D. (*People ex rel. Feuer v. Nestdrop, LLC* (2016) 245 Cal.App.4th 664, 669–670.) Those conditions included that the business "was established as of September 14, 2007, and registered with the City Clerk by November 13, 2007 [citation]; submits proof of continual 'operation at the location set forth in its original or any amended business tax registration or tax exemption certificate' [citation]; [and] registered to pay and pays applicable taxes to the City." (*Id.* at p. 670; see *People ex rel. Feuer v. Progressive Horizon, Inc.* (2016) 248 Cal.App.4th 533, 540.)

23

The parties do not dispute that the LLC obtained its BTRC prior to 2007 and was grandfathered through these changes in the law, enabling it to continue operating the dispensary at the time Stark allegedly converted the LLC to a corporation in 2015 and changed the address on the BTRC.

The law has continued to evolve. "On November 8, 2016, California voters passed as an initiative measure the Control, Regulate and Tax Adult Use of Marijuana Act, more commonly known as Proposition 64. [Citation.] Proposition 64 legalized adult, recreational use of marijuana and reduced the criminal penalties for various offenses involving marijuana, including its cultivation and possession for sale." (*County of Kern v. Alta Sierra Holistic Exchange Service* (2020) 46 Cal.App.5th 82, 106 (*County of Kern*).)

After the passage of Proposition 64, the Governor signed into law the Medicinal and Adult-Use Cannabis Regulation and Safety Act. (Bus. & Prof. Code, § 26000 et seq.) The statute repealed previous state law on medicinal marijuana and "created one regulatory system for both medicinal and adult-use (i.e., recreational) cannabis." (*County of Kern, supra,* 46 Cal.App.5th at p. 106.) It did not "supersede or limit the authority of a local jurisdiction to adopt and enforce local ordinances to regulate businesses licensed under this division, including, but not limited to, local zoning and land use requirements, business license requirements, and requirements related to reducing exposure to secondhand smoke, or to completely prohibit the establishment or operation of one or more types of businesses licensed under this division within the local jurisdiction." (Bus. & Prof. Code, § 26200, subd. (a); see *County of Kern, supra,* at p. 106.)

In response to these state-level changes, the City repealed Proposition D effective January 1, 2018 and replaced it with Ordinance No. 185343, a comprehensive licensing scheme for retail sales of marijuana.  (L.A. Mun. Code, § 104.00 et seq.; *People v. Onesra Enterprises, Inc.* (2018) 24 Cal.App.5th Supp. 9, 15.)  Ordinance No. 185343 was predicated on voter-enacted Proposition M passed the year before.  Through Proposition M, City voters "contemplated that [medical marijuana businesses] '*that have been operating in compliance with the limited immunity* [provided by Proposition D] . . . should continue to operate until City licenses or permits are available.' "  (*People v. Onesra Enterprises, Inc., supra,* at p. 20.)  To that end, Ordinance No. 185343 gave " 'an existing medical marijuana dispensary *that is in compliance* with all restrictions of Proposition D' . . . priority in obtaining a city license, only *as long as it has been in full compliance* with the Proposition D requirements for limited immunity.  (L.A. Mun. Code, § 104.07(a).)"  (*Id.* at p. 20.)

Thus, an existing medical marijuana dispensary that met " 'all of Proposition D requirements shall *continue* to have limited immunity up until the time the [existing medical marijuana dispensary] receives Temporary Approval' for a license to sell marijuana.'  (L.A. Mun. Code, § 104.07(b), italics added.)"  (*People v. Onesra Enterprises, Inc., supra,* 24 Cal.App.5th Supp. at pp. 20–21.)  Ordinance No. 185343 also gave Proposition D-compliant dispensaries limited immunity from prosecution while their license applications were processed (L.A. Mun. Code, § 104.07, subd. (b)) and exempted them from some pre-licensing inspection and zoning requirements (*id.*, § 104.07, subds. (g), (h)).

There was a time limit in Ordinance No. 185343 for Proposition D-compliant dispensaries to obtain priority

25

processing of licensing applications. They had to apply within 60 days after the Los Angeles Department of Cannabis Regulation began "accepting applications." (L.A. Mun. Code, § 104.07, subd. (a).) The record reflects the LLC sought to apply for this priority processing for a temporary license on January 30, 2018 by requesting the City unfreeze the BTRC. The City declined to process the application due to this ongoing litigation and the parties' competing claims to the BTRC. It appears plaintiffs received a temporary license for the Canoga Park dispensary in 2018 pending the City's review of the priority processing application and the outcome of this lawsuit.

This is a long way of saying the BTRC had real value to the LLC beyond registering with the City for tax purposes. It allowed the dispensary to operate when non-grandfathered dispensaries could not. More to the point, the parties are fighting tooth-and-nail over it in this litigation, and Stark has a contract to sell the dispensary business for nearly $2 million should he win. As plaintiffs' counsel astutely pointed out in the trial court, if the BTRC "has no value, give it to us, and [defendants] shouldn't care about it. If they're correct and it didn't matter, they have given [it] to us already. We'd have no case." Of course, defendants haven't taken plaintiffs up on that offer.

We think the circumstances and nature of the BTRC here points ineluctably to characterizing it as property that can be converted. The treatment of other government certificates and licenses provides the closest analog. In *Golden v. State* (1955) 133 Cal.App.2d 640 (*Golden*), the question was whether a federal tax lien could reach a liquor license as "property" under the federal tax code. Looking to the California Civil Code definitions of property, the court said yes. The license was "issued to a

26

specific person," was "renewable under the conditions expressed in the statute," and was "transferable from one person to another upon approval" by the regulating agency and upon paying a transfer fee. (*Golden, supra,* at p. 643.) The court noted the limits on the number of on-sale licenses, coupled with transferability, created substantial value in the license, as demonstrated by $7,700 a purchaser paid into escrow, "the license being the principle item of value in the transfer." (*Id.* at pp. 643–644.)

*G.S. Rasmussen & Assocs. v. Kalitta Flying Serv., Inc.* (9th Cir. 1992) 958 F.2d 896 (*G.S. Rasmussen*), was a conversion case involving a federally issued certificate permitting modifications to certain airplane designs. To obtain the certificate, the applicant must complete the "arduous process" of proving the modification is airworthy. (*Id.* at p. 899.) Taking a cue from *Golden* and other California cases, the federal court distilled three criteria to identify property subject to conversion in California: "First, there must be an interest capable of precise definition; second, it must be capable of exclusive possession or control; and third, the putative owner must have established a legitimate claim to exclusivity." (*G.S. Rasmussen,* at pp. 902–903, fns. omitted.)

The court applied these criteria to find the certificate was property subject to conversion. It was "capable of precise definition: It enables an airplane owner to obtain an airworthiness certificate for a particular design modification without the delay, burden and expense of proving to the FAA that the plane so modified will be safe." (*G.S. Rasmussen, supra,* 958 F.2d at p. 903.) Federal regulations restricted the rights in the certificate to the holder, creating exclusive possession. (*Ibid.*)

And the holder had a legitimate claim to exclusivity because he had invested significant time and effort to obtain the certificate. (*Ibid.*)

Plaintiffs urge us to apply this three-part test from *G.S. Rasmussen* to the BTRC. (See, e.g., *Welco Electronics, supra,* 223 Cal.App.4th at p. 211 [applying test to find credit line from credit card was subject to conversion]; *Kremen v. Cohen* (9th Cir. 2003) 337 F.3d 1024, 1030 [applying test to find Internet domain name was property subject to conversion].) Without deciding whether this test is always applicable in every case in which the property element of conversion is implicated, we agree the test stakes out useful guideposts here.

*Interest Capable of Precise Definition.* This criterion is easily met. A BTRC is a necessary feature for every business operating in the City. The LLC's grandfathered BTRC for the medical marijuana dispensary here was capable of even more precise definition because it enabled that business to continue when dispensaries without grandfathered BTRCs could not. More so than the airworthiness certificate in *G.S. Rasmussen* that merely allowed the holder to avoid additional delay, burden, and expense, the BTRC enabled the dispensary to *exist*.

*Exclusive Possession or Control.* This criterion is met because a BTRC is exclusive to the business that obtains it. Indeed, it is not transferable except when the underlying business is transferred and only in limited circumstances. (L.A. Mun. Code, § 21.11.)

*Legitimate Claim to Exclusivity.* This criterion is similarly met because the LLC applied for and maintained the BTRC for the Canoga Park dispensary location since 2007 until Stark attempted to change the registration address in 2015. The BTRC

28

enabled the dispensary to navigate the City's bans on similar dispensaries and may still provide preferential benefits. Again, like the time and effort to obtain the certificate in *G.S. Rasmussen*, the LLC's efforts in obtaining and maintaining the BTRC established its legitimate claim to exclusivity.

Defendants insist the sin qua non of property is transferability, and because, in their view, the BTRC "cannot be transferred or sold, it is not property under Civil Code section 654." (See *Yuba River Power Co. v. Nevada Irrigation Dist.* (1929) 207 Cal. 521, 523 [" 'The term "property" is sufficiently comprehensive to include every species of estate, real and personal, and everything which one person can own and *transfer to another*. It extends to every species of right and interest capable of being enjoyed as such upon which it is practical to place a money value.' " (Italics added.)]; *Douglas Aircraft Co. v. Byram* (1943) 57 Cal.App.2d 311, 317; see also *In re Marriage of McTiernan & Dubrow* (2005) 133 Cal.App.4th 1090, 1100 ["[E]ven if incorporeal or intangible, property must be capable of being transferred. '[I]t is a fundamental principle of law that one of the chief incidents of ownership in property is the right to transfer it.' [Citation.] 'A common characteristic of a property right, is that it may be disposed of, transferred to another.' "].)

None of the cases defendants cite involved the tort of conversion. As for the cases we have discussed, *Golden* found the transferability of the liquor license significant in defining it as property for the purpose of a federal tax lien statute. While *G.S. Rasmussen* did involve conversion and the court found it "relevant" that the certificate at issue was "transferrable and it may be licensed, in accordance with FAA procedures" (*G.S. Rasmussen, supra,* 958 F.2d at pp. 901–902), the court did not

29

mention transferability in its three-part test for defining property.

Whether the tort of conversion requires that the property be transferable is a question we need not decide because defendants' factual premise is incorrect. As noted, a BTRC *can* be transferred, albeit in a very circumscribed way—as part of the sale of the business to which it belongs and only if "the real or ultimate ownership of the business after the transfer is substantially similar to the real or ultimate ownership existing before the transfer." (L.A. Mun. Code, § 21.11.) Defendants have cited no law suggesting these kinds of strict limits on transferability strip the BTRC of its character as property for the purpose of conversion. (See Civ. Code, § 679 ["The ownership of property is absolute when a single person has the absolute dominion over it, and may use it or dispose of it according to his pleasure, *subject only to general laws*." (Italics added.)]; 51 Cal.Jur.3d Property, § 32 ["Even when transfer is generally permitted, restrictions on the manner of disposal of personal property may be enacted . . . ."].)[6]

In the context of this case, the BTRC is a sufficiently definable interest exclusive to the LLC that it qualifies as property subject to conversion as a matter of law. The trial court erred in instructing the jury otherwise.

---

[6] Defendants note the back of the BTRC says: "This certificate is void upon any change of ownership or location." That may be true for a general change of ownership, but the BTRC may be transferred between the same effective owners as part of a transfer of the taxed business, as permitted by the Municipal Code.

This error almost certainly affected the jury's verdict. The LLC's conversion claim rested primarily on the theft of the BTRC. The jury must have focused on the BTRC because it not only asked what "property" meant in the verdict form but also asked specifically whether the BTRC qualified as property. When the court told them it was not property, the jury returned a defense verdict within 10 minutes, a strong signal the nature of the BTRC was dispositive. (Cf. *Sandoval v. Bank of America* (2002) 94 Cal.App.4th 1378, 1388 [question about verdict form reflected jury's confusion, which was exacerbated by court's erroneous response].) If the BTRC was not property as the court instructed the jury, the only "property" subject to conversion was perhaps the LLC's physical assets, money, and product at the Canoga Park dispensary. The evidence was undisputed defendants took nothing from the dispensary, so it's no surprise the jury so quickly found the LLC had the right to possess "the property" but the corporation did not interfere with that right.

Defendants seem to imply plaintiffs suffered no prejudice from the court's incorrect instruction because they failed to offer any evidence of damages. They cite testimony from Kersey that "the dispensary wasn't making money for several years, especially during the time that [Stark] was the owner." But the LLC didn't seek lost profits as damages. As the jury was instructed, the LLC sought the fair market value of the "property" and compensation for the time and money it spent in attempting to recover the "property." (See Civ. Code, § 3336.) The jury could have concluded the grandfathered BTRC had significant value by allowing the dispensary to continue operating as the legal landscape around it changed. This is perhaps best demonstrated by the nearly $2 million price tag on

the corporation should the corporation be declared the rightful owner of the dispensary and the BTRC.

The trial court prejudicially erred by refusing to give the LLC's proposed instruction that the BTRC was property and then instructing the jury the BTRC was not property as a matter of law. Upon any retrial, the court must instruct the jury the BTRC at issue here qualifies as property for the tort of conversion.

### 3. *Plaintiffs Complied with Government Code Section 12261*

Government Code section 12261 creates a procedure for the Secretary of State to reinstate a business entity to active status if "a court finds any of the following: [¶] (1) The factual representations by a shareholder, member, partner, or other person that are contained in the termination document are materially false. [¶] (2) The submission of the termination document to the Secretary of State for filing is fraudulent." (Gov. Code, § 12261, subd. (a).)[7] If a court orders reinstatement, the statute sets forth the information that must be contained in the court order. (*Id.*, § 12261, subd. (b).) At issue here is the statutory procedure to obtain this court order: "The court order for reinstatement may be obtained by submitting a petition to the

---

[7] A "termination document" is defined as "the certificate or other document required by the Corporations Code that is the last certificate or document filed with the Secretary of State to effect the final dissolution, surrender, or cancellation of the business entity." (Gov. Code, § 12260.) While the conversion document Stark filed isn't listed, it qualifies because "[t]he filing with the Secretary of State of . . . articles of incorporation containing a statement of conversion . . . shall have the effect of the filing of a certificate of cancellation by the converting limited liability company . . . ." (Corp. Code, § 17710.06, subd. (d).)

32

superior court containing the legal and factual basis for reinstatement or as part of a civil action for damages or equitable relief. The Secretary of State shall not be made a party to the proceeding." (*Id.*, § 12261, subd. (c).)

In the trial court, defendants sought nonsuit on the LLC's claims, arguing the LLC "lacked capacity" by not filing a petition for reinstatement pursuant to this provision. Defendants also sought nonsuit against both Kersey and the LLC on their declaratory relief claims because they did not "exhaust legal remedies," again by not filing a petition to reinstate the LLC. It appears the court rejected these arguments because it allowed the LLC's conversion and declaratory relief claims to proceed. If the court had believed the LLC was required to file a petition for reinstatement under this statute, then it would have dismissed all of the LLC's claims.[8]

On appeal, defendants raise a new argument that *Kersey* lacked standing because she did not "restore" her interest in the LLC by petitioning for reinstatement pursuant to Government Code section 12261. While a party normally forfeits a claim raised for the first time on appeal (*Truck Ins. Exchange v. AMCO Ins. Co.* (2020) 56 Cal.App.5th 619, 635), plaintiffs do not argue forfeiture, so we turn to the merits.

---

[8] Plaintiffs did not address the Government Code section 12261 issue in their opening brief on appeal, taking the position that the trial court must have rejected defendants' arguments. In response, defendants argue plaintiffs forfeited the issue by not addressing it, taking the position the trial court *did* accept this argument in granting nonsuit. We agree with plaintiffs. We find no forfeiture under the circumstances.

33

Defendants' position that Kersey needed to file a *separate* petition to reinstate the LLC pursuant to Government Code section 12261 contradicts the plain language of the statute. When we interpret a statute, " 'our goal is "to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law." ' [Citation.] First, we must look to the words of the statute, which generally provide the most reliable indicator of legislative intent. [Citation.] If the statutory language is unambiguous, then we presume the Legislature meant what it said and our inquiry ends." (*Barker v. Garza* (2013) 218 Cal.App.4th 1449, 1454.)

Government Code section 12261 is clear: an individual may obtain a court order for reinstatement of a wrongly terminated business entity in one of two ways, *either* by (1) "submitting a petition to the superior court containing the legal and factual basis for reinstatement" *or* (2) "as part of a civil action for damages or equitable relief." (Gov. Code, § 12261, subd. (c).) Defendants' view that plaintiffs needed to file a stand-alone petition before pursuing their claims in this case is simply wrong.

While a separate petition is not necessary, plaintiffs did not expressly plead a claim for reinstatement pursuant to Government Code section 12261 as part of their complaint. But the statute does not impose any specific pleading requirements when seeking an order as part of a civil case. The statute only imposes a pleading requirement for a stand-alone *petition*, which must "contain[] the legal and factual basis for reinstatement." This distinction makes sense. A court evaluating a stand-alone petition may know nothing about the

34

facts supporting reinstatement, whereas a court handling other claims in a civil case probably will.

Plaintiffs' complaint here was enough—albeit *barely*—to obtain an order for reinstatement, should one be warranted. The complaint was built on the core factual allegation that Stark transferred his membership in the LLC then filed documents with the Secretary of State converting the LLC and falsely representing he still had that membership interest. Plaintiffs sought a declaration that Kersey was the owner of the LLC and Stark was not. If a jury were to find Stark transferred his membership interest in the LLC to Kersey, plaintiffs' complaint gave the trial court adequate grounds to issue an order declaring Stark fraudulently converted the LLC and reinstating the LLC. While we encourage parties in future cases to more clearly plead relief under Government Code section 12261, plaintiffs' complaint was enough here.

For similar reasons, we reject defendants' argument plaintiffs failed to expressly "plead that the modification filings were materially false or fraudulent." This presumably refers to subdivision (a) of the statute, which directs the Secretary of State to reinstate an entity if a court finds factual representations were "materially false" or submission of the termination document was "fraudulent." Again, this is not a *pleading* requirement. Even if it were, plaintiffs alleged Stark filed documents converting the LLC "without basis or authority" and was "never authorized" to convert the LLC to a corporation or mutual benefit corporation. While not using the magic words "fraudulent" or "materially false," this was sufficient to allege entitlement to an "order for reinstatement . . . as part of a civil action for damages or

35

equitable relief," should one be warranted.  (Gov. Code, § 12261, subd. (c).)

**DISPOSITION**

The judgment is reversed and the matter is remanded for further proceedings consistent with this opinion.  Appellants are entitled to costs on appeal.

**CERTIFIED FOR PUBLICATION**


BIGELOW, P. J.


We Concur:


STRATTON, J.


WILEY, J.